# EXHIBIT D

# In The Matter Of:
## *TALBOT 2002 UNDERWRITING vs. OLD WHITE CHARITIES*

### *JAMES C. JUSTICE, II*
### *August 22, 2016*



### JPA REPORTING, LLC
### CERTIFIED COURT REPORTERS

1776 PEACHTREE STREET, N.W.
SUITE 230-S
ATLANTA, GEORGIA 30309
404-853-1811
1-888-947-2963

*Original File 0822Justice16.txt*
*Min-U-Script® with Word Index*

Page 9

[1] the Pro-Am. And so all three guys did.
[2] And at the time that we were doing that, I
[3] said one of the components of The Greenbrier or Old
[4] White Charities' insurance was the hole-in-one
[5] insurance. And I, I told them, you know, about it,
[6] about what we'd done in the past and all that kind of
[7] stuff. And I told them how I wanted them to get it
[8] insured. I told them, you know, that we, we wanted to
[9] be able, on the first hole in one, to give away $100 to
[10] everybody that's in the stands. And I told them an
[11] estimate on the number of people that were probably
[12] going to be in the stands. And then I told them on the
[13] second hole in one, you know, we wanted to give away
[14] 500, and on a third hole in one a thousand.
[15] I told --
[16] Q Now, when was this conversation? The Pro-Am
[17] you're talking about, is it the Pro-Am in connection
[18] with the tournament?
[19] A Yes. It's the Wednesday before the tournament
[20] starts on Thursday.
[21] Q Okay. Now, so you were having this discussion
[22] with them the Wednesday before the tournament, or --
[23] A No.
[24] Q -- is this the year prior?
[25] A No. It wasn't a year prior but it was

Page 10

[1] probably, oh, I don't know, two or three months prior to
[2] the tournament.
[3] Q Okay. So it wasn't at the Pro-Am that was --
[4] A No.
[5] Q -- part of the tournament?
[6] A No. No.
[7] Q I misunderstood. I wanted to make sure.
[8] A No. But at that time we discussed, we
[9] discussed the prize money that we would be giving away,
[10] what we'd basically be insuring. And we discussed the
[11] number of days that we would insure that and how that it
[12] would cumulative come into effect, meaning that we were
[13] going to insure it for five days, inclusive of the
[14] Pro-Am, and the Pro-Am would have basically 208
[15] possibilities, because there was 52 teams in the Pro-Am,
[16] and so 52 teams with four players on a team. And then
[17] after that, after the Pro-Am on Wednesday, then on
[18] Thursday there would be a full field. And I don't know
[19] what the full field is, but it's close to 160 players.
[20] And then Thursday/Friday you have 160 players, then
[21] Friday/Saturday it's cut, and you have about 70 players
[22] for Saturday/Sunday.
[23] I also discussed with them that one of the,
[24] one of the absolute requirements had to be that we had
[25] no, we have no say as to where the PGA places the pin

Page 11

[1] marker -- I mean the tee markers, and so as far as the
[2] yardage requirement, there could be no yardage
[3] requirement. I told them that point blank, could be no,
[4] because --
[5] Q Yeah.
[6] A Because -- let me finish, because in the
[7] Pro-Am, you play at a significantly lesser yardage than
[8] what the pros play later on in the week. And the
[9] amateurs are playing from a tee marker of probably, you
[10] know, if I were to go back and look, I would say at
[11] 115 yards. So, so the amateurs played all at that. The
[12] Bankers people played in the Pro-Am.
[13] So my, my insurance reps played in the Pro-Am
[14] trying to make a hole in one that counted towards this
[15] payoff from a yardage that -- and all of them are
[16] golfers. They're not just 30 handicappers, they're
[17] golfers, you know. So they all played, so they knew
[18] ever so well exactly what they were doing.
[19] Q What I wanted to ask you, now, you previously
[20] had had hole-in-one competitions the year prior;
[21] correct?
[22] A We have.
[23] Q Okay. Did that policy contain a minimum
[24] yardage requirement?
[25] A I do not know that.

Page 12

[1] Q I'm going to show you a document.
[2] MR. FIELDS: Let's mark this as Justice
[3] Exhibit 1.
[4]
[5] (Justice Deposition Exhibit 1
[6] was marked for identification)
[7]
[8] BY MR. FIELDS:
[9] Q Sir, this is a, I will represent to you this
[10] is an application for Old White Charities for the 2014
[11] year through the National Indemnity Group.
[12] A Okay.
[13] Q Have you ever seen this document before?
[14] A I have not.
[15] Q Okay. This is the application. I would --
[16] you're happy to look through it.
[17] A Okay.
[18] Q Okay. And this looks to me -- you said you
[19] haven't seen it before. I'll represent to you, I think
[20] this is a quote for the prior year's hole-in-one
[21] coverage. Would you look at the middle of there, and it
[22] lists the target hole information. See that --
[23] A Okay.
[24] Q -- on the first page?
[25]

### Page 21

[1] Bankers people.
[2]  Q  Okay. And you did not review this
[3] application?
[4]  A  I did not.
[5]  Q  And you would agree with me that this
[6] application as it stands right here represents that any
[7] holes in one must be taken from a distance of at least
[8] 150 yards for all competitors?
[9]      MR. PALAIS: Object to the form.
[10]     MR. MASTERS: Object to form and foundation.
[11] BY MR. FIELDS:
[12]  Q  Okay. You can answer.
[13]  A  I can agree with you that if you just read
[14] this one sentence, that's what the one sentence says.
[15]  Q  And it's not marked through, correct?
[16]  A  It's not.
[17]  Q  And previously in item seven where they wanted
[18] to be a change, it was marked through; correct?
[19]  A  That's right.
[20]  Q  And would you also agree with me that the
[21] holes in one that were made on the first day of
[22] professional play, I guess that was Thursday, were from
[23] a distance of 137 yards?
[24]  A  That's what I understand, yes.
[25]  Q  All right. And, in fact, you were there, I

### Page 22

[1] believe, at those, when those holes in ones were made;
[2] correct?
[3]      MR. MASTERS: Objection as to form.
[4] BY MR. FIELDS:
[5]  Q  You can answer it.
[6]  A  I think I was there for one. And then they
[7] called me when the second one was made.
[8]  Q  And then --
[9]  A  I was on the property.
[10]  Q  Right.
[11]  A  Yeah.
[12]  Q  And you actually handed out money, did you
[13] not, to --
[14]  A  I did, on both.
[15]  Q  Okay. And so would you agree with me that
[16] regardless of anything that the policy says later, that
[17] based upon item 14, part 2, the holes in one that were
[18] taken were not made from a distance of 150 yards?
[19]     MR. MASTERS: Object to the form --
[20]     MS. VARNER: Object to the form.
[21]     MR. MASTERS: -- of the question. Object to
[22] the foundation. And it's confusing.
[23] BY MR. FIELDS:
[24]  Q  You can answer.
[25]  A  You know, after, after the fact, I would say

### Page 23

[1] the PGA, again, the PGA selects the site. You know, we
[2] have no jurisdiction whatsoever where they're going to
[3] put the tee markers. And after the fact and after all
[4] the lawsuits and everything else, I know, I know now
[5] that it was at 137 yards.
[6]  Q  Right, which we agree is less than 150 yards?
[7]  A  Right.
[8]  Q  Okay.
[9]  A  Or 138 or so.
[10]  Q  I think it was 137.
[11]  A  Okay.
[12]  Q  In fact, I don't think all these papers --
[13] let's mark this as Exhibit 4.
[14]
[15]     (Justice Deposition Exhibit 4
[16]      was marked for identification)
[17]
[18]     MR. MASTERS: This is Exhibit?
[19]     THE REPORTER: Four, sir.
[20]     MR. MASTERS: Go ahead.
[21]     THE WITNESS: I'd like to finish reading it
[22] (perusing document). Okay.
[23] BY MR. FIELDS:
[24]  Q  So if you look at Exhibit 4, this is a Golf
[25] Central Blog from the Golf Channel digest -- Golf

### Page 24

[1] Channel Digital, excuse me. And this confirms that, on
[2] the third paragraph, that "George McNeill jarred a
[3] pitching wedge from 137 yards, earning $100 apiece for
[4] each of the spectators with the foresight to arrive
[5] early."
[6]  A  Okay.
[7]  Q  Does this confirm your understanding that it
[8] was, the distance was 137 yards?
[9]  A  It does.
[10]  Q  Let me ask you, what was the purpose behind
[11] the hole-in-one event? Was it to drive attendance?
[12]  A  It was. It was.
[13]  Q  And out of curiosity, I think would it be fair
[14] to say that this is one of the lower population areas
[15] that holds a PGA Tour event?
[16]  A  It is.
[17]  Q  And so -- and you've had it for six years?
[18]  A  That's right. This, I think this was the
[19] seventh year or sixth year.
[20]  Q  This was --
[21]  A  I don't know.
[22]  Q  So, you know, just from demographics, in
[23] trying to generate attendance at a tournament like this,
[24] you probably want to try to get people to come, give
[25] them a reason to come; is that accurate?

Page 41

[1]  A    No. No. I mean, other than all the stuff
[2]  I've already told you.
[3]  Q    Right. Okay. Understand, all I'm trying to
[4]  do is make sure --
[5]  A    Oh, sure.
[6]  Q    -- I understand what everybody's position is.
[7]       Now, there have been some allegations made
[8]  about damages that you have suffered from this
[9]  litigation.
[10] A    That's for sure.
[11] Q    Do you have any knowledge of that?
[12] A    I sure do.
[13] Q    Okay. What is that?
[14] A    Well, that's what I think is by far and above
[15] the most serious thing. As far as the -- as far as what
[16] we did in regard to coverage, you know, whether Bankers,
[17] All Risk, I don't even know the insurance companies,
[18] HCC, whomever is responsible for the 900,000, somebody's
[19] responsible and it's not me. I will promise you that.
[20] Because I was told -- I mean, I told everybody exactly
[21] how to, how to bind the coverage.
[22]      You know, evidently someone, maybe myself,
[23] approved the premium, the premium dollars. I was told
[24] the insurance was bound. Hole in ones were made and
[25] then, you know, somebody is not paying me. I gave money

Page 42

[1]  away. I paid my premium. You know, somebody's
[2]  responsible. I don't know who exactly's responsible,
[3]  but somebody is dad-gum-well responsible.
[4]       But then it takes on a new life, and here's
[5]  the new life. And this is the life that I think, Paul,
[6]  that you should be way more concerned about than the
[7]  900,000, and that is this. You have defamed Jim
[8]  Justice. And it's not in -- and not to take anything
[9]  away from the common everyday guy, but defaming Jim
[10] Justice is a bigtime deal. It's a bigtime deal. And,
[11] and you did that because HCC sued Old White Charities,
[12] and they, and they named me, you know, which they didn't
[13] have to do unless they were intentionally trying to hurt
[14] me. And they did. They put it all over the newspaper.
[15] It went viral. It went everywhere. Then I had to
[16] contend with answering every question known to man and
[17] everything else under the sun. That's probably what
[18] they wanted to have happen, and they achieved that.
[19]      Now, in doing so, the next thing that you
[20] should be the most concerned about is just this: When a
[21] charitable organization loses its credibility, all kinds
[22] of bad things start happening. Our sponsorship levels
[23] from 2015 to 2016 when we were going to have the
[24] tournament fell 45-plus percent. Our ticket sales fell
[25] from a million-one and change on ticket sales down to

Page 43

[1]  $84,000, 92 or 3 percent. Absolutely it wrecked Old
[2]  White Charities all over the place and everything. It
[3]  wrecked, wrecked, wrecked. And it surely harmed me.
[4]       As far as the 900,000, somebody's going to pay
[5]  that, and I'll promise you that. But your problem is
[6]  far, far more reaching than the 900,000 on the, you
[7]  know, on the insurance claim, you know, for the hole in
[8]  one. Very, very foolish and silly move and everything,
[9]  and it's been very harmful. It's been very, very
[10] harmful to Old White Charities and it's been harmful to
[11] me.
[12] Q    Okay. So what was wrong -- you say it's been
[13] harmful. What was done that was wrongful -- that was
[14] harmful other than asking whether there was coverage for
[15] this event?
[16] A    Well, I don't recall -- I mean, the papers
[17] didn't run it that way at all. The papers ran it that
[18] Justice never paid his premium and therefore he never
[19] had the coverage from the insurance companies, and on
[20] and on and on and on and on.
[21]      Now, and the other thing that is so bizarre to
[22] me that's off the chart is, it's HCC's responsibility to
[23] find out if Justice paid his premium. I mean, for God
[24] sakes living, these people are in the insurance
[25] business. These people are not, you know, country

Page 44

[1]  bumpkins. I mean, HCC should have known that I paid my
[2]  premium and I paid it timely and everything. I can't
[3]  tell you what Bankers did, but I think that they paid
[4]  their invoice timely. And HCC runs off into the world
[5]  and sues me and, and puts out that I have not paid their
[6]  premium and on and on and on, you know.
[7]  Q    Okay.
[8]       MR. FIELDS: Could we mark this as Exhibit 7?
[9]
[10]      (Justice Deposition Exhibit 7
[11]      was marked for identification)
[12]
[13] BY MR. FIELDS:
[14] Q    Mr. Justice, I'm going to show you a document
[15] that's marked as Exhibit 7. And the first page there is
[16] an e-mail from Hugh Mooney at All Risk to Marshall
[17] Fleming and Jeff Brugh, with some copies to Paul
[18] Fleming, Mike Connatser and Ron Stierstorfer.
[19]      You can read the whole document, but I'd like
[20] to direct your attention to the very bottom, the third
[21] line from the bottom of the first page, which indicates
[22] that the $112,684.10 was wired to carrier 8/21/15, which
[23] I'll represent to you is after the litigation was filed.
[24] See that?
[25]      MR. PALAIS: Paul, excuse me. Where are you